IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 15, 2023 Session

## STATE OF TENNESSEE v. DEIRDRE MARIE RICH

**Appeal from the Circuit Court for Dickson County**
**No. 2017-CR-214   Larry J. Wallace, Judge**

_____

### No. M2022-00435-CCA-R3-CD

_____

Defendant, Deirdre Marie Rich, appeals from her conviction for first degree premeditated murder, for which she received a sentence of life imprisonment. Defendant contends that: (1) the evidence is insufficient to support her conviction; (2) the trial court erred by failing to instruct the jury on self-defense; and (3) the trial court erred in admitting entries from the victim's ex-wife's journal in violation of Defendant's right to confrontation. Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Michael J. Flanagan (on appeal and at trial) and Tim Wills (at trial), Nashville, Tennessee, for the appellant, Deirdre Marie Rich.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; and W. Ray Crouch, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

This appeal concerns the death of the victim, Kevin Rich, who was shot and killed by his then-wife, Defendant, on March 20, 2017. The Dickson County Grand Jury initially indicted Defendant on a charge of second degree murder but later issued a superseding

indictment charging Defendant with second degree murder in Count One and first degree premeditated murder in Count Two. The case proceeded to trial in March 2021.

Christopher Woodard, a dispatcher for Dickson County Emergency 9-1-1, testified that, on March 20, 2017, he answered two 9-1-1 calls in connection with this case. He explained that the first call was made by the victim's father at 8:02 p.m. and that the second call was made by the victim's mother at 8:08 p.m.

Ann Rich, the victim's mother, testified that she lived on approximately forty-two acres of land off Log Wall Road in Dickson County. She explained that the victim was her only son and was born in 1970. She said that she and her husband built two houses on their property with the family living in the first house for seven years before building and moving into the second one. She stated that the victim married a woman named Patricia Evans when he was nineteen years old; they lived together in the first house built on the property during the duration of their twenty-five-year marriage, but they eventually divorced.

The victim's mother testified that, on the evening of March 20, 2017, the victim, who worked as an HVAC technician, drove his work van to her house to work on her water heater. When it began to storm, the victim said that he was going to go home but that he would return the following afternoon to check the thermostat on the water heater. The victim's mother testified that the victim left her house around 6:45 or 6:50 p.m. and that this was the last time she saw the victim alive. She stated that she received a phone call from the victim's wife, Defendant, at 7:54 p.m. She testified, "I answered the phone on the first ring because I was standing right by it, and I got a dial tone. I h[u]ng the phone up and I dial[ed] right back. I g[o]t a busy signal." She received a second phone call from Defendant at 8:00 p.m. Regarding this call, the victim's mother testified:

> [Defendant] said, "you need to come over." She said, "[The victim] needs you. Come quick. Come directly." Then she said, "he's been shot." And I didn't ask where or anything.
>
> . . . .
>
> I just said, . . . "I'll be right there."
>
> . . . .
>
> And I told my husband, I said, "call 9-1-1." I said, "something is wrong with [the victim]."

The victim's mother drove over to the victim's home where Defendant directed her to the den at the back of the residence. She saw the victim lying on the floor "flat on his back with his hands down to his side"; the victim was "motionless, with . . . all his blood out on the floor and him in it." The victim's mother testified that the victim appeared to have "been placed there" on the floor. She said that Defendant was on her knees beside the victim with her hand placed on a wound to the victim's neck, "but there was no blood coming out." The victim's mother testified that, when she asked Defendant what happened, Defendant said that she and the victim "got into it." Defendant said, "I got the gun out of the safe, and he shot himself."

The victim's mother recalled that Defendant was dressed in a shirt with a white background. Defendant was holding a cell phone in her hand, and she gave it to the victim's mother and told her to call 9-1-1. The victim's mother testified that the cell phone was a "smart phone," that she did not know how to operate it, and that Defendant had to tell her which screen to view and which icon to use to make the phone call. While on the phone with the 9-1-1 operator, the victim's mother told the dispatcher that "[Defendant] got the gun out of the safe."

The victim's mother said that she returned to her house and told the victim's father the victim had been shot. She then drove down their driveway to unlock the gate for first responders and lead them up to the victim's house. The victim's mother testified that, after officers arrived, she saw Defendant on the porch and that Defendant was wearing a solid black dress. She commented to the victim's father that she could not believe law enforcement allowed Defendant to change clothes.

Regarding the shotgun Defendant used to shoot the victim, the victim's mother recalled, "It was his first gun that we had gotten him for Christmas when he became old enough to get the Hunter's Safety Course." She said that she visited the victim's house regularly and had a key to the front door. She said that she never saw the shotgun out around the house. She testified that the victim was meticulous about keeping his firearms locked up in a gun safe, which was in the den where he was killed. She said that she did not have a key to the victim's gun safe and did not know the combination to unlock it. She noted that the victim always "pulled his shoes off at the front door" and that, when his boots were wet, "[h]e would . . . put them on that boot dryer in the laundry room." She said that she saw the victim's boots on the boot dryer when she went inside the victim's home that night.

The victim's mother provided a written statement to law enforcement that night, in which she said that Defendant had previously threatened the victim. She said:

I talked to [Defendant] when I was over there that day and she told me, she said, "[W]e got into it." And . . . she said, "I kneed him in the groin. But if we had had the combination to the safe, I would have shot him."

Me being his mother had trouble believing someone would say that to me. And I said, "[D]on't shoot him." [Defendant] said, "I'll tie him to the bed, call you the next day to come and turn him loose, or . . . I'll tie him to the bed and beat him with a belt."

And like I say, I had trouble believing anybody would say that and be serious saying it to someone's mother.

Eric Stewart, a paramedic with Dickson County Emergency Services, testified that he responded to the victim's residence on March 20, 2017. Mr. Stewart said that the initial report was of a gunshot wound to the neck and that it was "believed to be a self-inflicted possible suicide type of injury." Mr. Stewart arrived at the victim's house at 8:19 p.m. He found the victim in a den at the back of the residence, which he described as "a small . . . den/study type area." The victim was lying flat on his back on the floor. Mr. Stewart checked the victim for vital signs but found none. Mr. Stewart explained that the victim had a "penetrating injury to the base of his neck" and had lost a substantial amount of blood. Mr. Stewart noted in his report that Defendant admitted to shooting the victim.

Sergeant James Gardner with the Dickson County Sheriff's Office (DCSO) testified that he was dispatched to the scene of the shooting at 8:08 p.m. Sergeant Gardner explained that he wore a body camera that night and that he turned it on before entering the victim's house. The gate to the property was open when he arrived, and the victim's mother led him down the driveway. When he entered the house, Sergeant Gardner saw the victim's body in the den at the back of the house. He took Defendant, who was still inside the residence, into a different room to preserve the scene. Defendant began telling Sergeant Gardner what had happened but then stopped to ask him to turn off the stove where she had a white liquid cooking in a saucepan on a burner.

Defendant told Sergeant Gardner that the victim returned from his parents' house around 6:30 p.m. She said that they began arguing about a ringback tone on her cell phone, and that the victim got upset and slapped her on the chest. Defendant said that she sat down in the front room with her Bible but that the victim then "chased her around the house" and cornered her in a bathroom. Defendant told Sergeant Gardner that she was tired of getting slapped and beaten, and she said that the victim would get "pissy" after visiting his parents and "take it out on [her]." She said that she told the victim she would not take any further abuse from him. Defendant said that she then tried to call her brother and a friend, Bobby

- 4 -

Larrison, but received no answer. She said that she then called the victim's parents but that the victim ended the call.

Defendant recounted that, around 8:00 p.m., she went to the bathroom to take a shower and that the victim followed her and continued arguing with her. She claimed that she told the victim she was not his "punching bag" and that she "rebuked" him and told him to leave the house. She said that the victim ran outside but returned to the house and began calling her names and telling her that he hated her. Defendant recounted, "[The victim] says 'I'm tired of you.' He goes, 'You're leaving tonight in a body bag.' Whatever. I said, 'Bring it on. I don't care.'"

Defendant told Sergeant Gardner that the victim then went to the den and retrieved the shotgun from between the desk and the wall but that he could not find any shells. Defendant recounted, "[H]e says, 'I'm going to shoot you.' Go ahead. He couldn't find the shells." She said that the victim put the gun back by the desk and returned to the kitchen where he screamed at her and shoved her. Defendant said that she went to the den to retrieve her car title, intending to leave the residence. She claimed that the victim stood in the doorway of the den and told her that she was not going anywhere. Defendant said that she told the victim she was leaving but that the victim told her she would leave the house that night in a body bag, to which Defendant replied, "Whatever. I'll pull the gun myself. I'm tired of fighting with you. I can't do this anymore."

Defendant recounted that the victim said she "didn't have the balls" to shoot him. Defendant then retrieved the shotgun from behind the desk, got two shells out of a red basket, and put one of the shells in the gun. Defendant said that she cocked the hammer of the shotgun, that the victim charged her, that she pulled the gun up to shoot the ceiling but that "he was there" and she shot him. She reported that the shot lifted the victim off his feet, and he fell onto the floor and said, "[Y]ou're a bitch." Defendant stated that she put her fingers in the hole created by the shot and gave the victim "mouth to mouth," and then he died. She said that, after shooting the victim, she called the victim's mother instead of 9-1-1.

Defendant told Sergeant Gardner that the victim had abused her before. She said that the victim hit her in the chest in September 2016, but that she did not call the police because she lived too far from the main road and because the victim said he could bury her without anyone knowing. She claimed that, during an argument in November 2016, the victim pushed her and that, on New Years Eve, the victim chased her around the house and sat on her chest, causing bruises. When asked why she had not called police after she "was safe and out in the public," Defendant said that she had told the victim's parents about the abuse and that the victim's father had told her, "If you ever hurt my son, [if] you ever hurt a hair on his head, I will kill you, I will put you in a body bag, and I will bury you and

nobody will find you." Defendant then commented, "I figured I could take a beatin' but I can't take a gun." She also claimed that the victim had slapped his ex-wife several times as well.

When asked if he observed any injuries to Defendant, Sergeant Gardner said, "Nothing was visible. I think twice I shined the flashlight on her face and chest area. She had blood, but it was transferred blood[.]" He noted that, inside the residence, he saw a wedding band on the kitchen counter. Defendant told Sergeant Gardner that the wedding band had belonged to the victim and that he had taken it off that night because he had been mad at her.

Detective Sarah McCartney with the DCSO testified that she assisted the lead detective, Detective Jeff Lovell, after responding to the crime scene. Detective McCartney said that she arrived around 8:30 p.m. and saw Defendant sitting in a small chair in the kitchen talking with Sergeant Gardner. Detective McCartney noted that Defendant was wearing a black dress and had blood on her hands. Sergeant Gardner had already read Defendant her *Miranda* rights, but Detective McCartney reviewed those rights with her again before asking what happened. Detective McCartney transcribed Defendant's statement as Defendant spoke. At the end of the interview, she reviewed the statement with Defendant "line-by-line," and then Defendant signed the statement.

In her statement to Detective McCartney, Defendant recounted that the victim had returned from his parents' home around 6:30 p.m. and that they had begun arguing about ringback tones on Defendant's cell phone. She stated that, during the argument, the victim tried to take her phone but that she "rebuked him," and he ran outside. Defendant said that, when the victim came back inside, she was going to make the victim a plate of food, but he called her names, and the argument resumed. She said that, at 7:35 p.m., the victim took his ring off and placed it on the kitchen counter. Defendant then retrieved her phone and Bible and went to the bathroom to take a shower with the victim following her into the bathroom. She said that she turned on the water for her shower. She stated that she and the victim argued for ten to fifteen minutes inside the bathroom, explaining that they called each other names and that the victim shoved her in the chest.

Defendant told Detective McCartney that she then went into the living room where she accidentally called her brother, the victim's parents, and Mr. Larrison. She said that the victim took her phone and shoved her into a chair. She said that she then went to the den, sat down, and grabbed the shotgun, which was sitting between the desk and the wall. Defendant said that she put a shell in the shotgun and "clicked" the gun shut. She said that the victim was standing by the door to the laundry room, which was attached to the den; he took two steps forward and began laughing and grinning. She said that the victim asked her, "What are you gonna do? Shoot me?" Defendant said she then told the victim, "[I]f

- 6 -

you come any closer to hurt me I'm going to either shoot you or shoot me. One of us is going out in a body bag tonight." According to Defendant, the victim said she "didn't have the balls," and she stood up and said, "I'm not playing, get away from me." Defendant said that the victim came towards her, that she raised the gun up toward the ceiling, and that she "got him instead." Defendant stated, "I was going to shoot the ceiling, but he rushed me. I was going to scare him."

Detective McCartney testified that the sheriff's office later conducted a "data dump" on Defendant's cell phone, showing Defendant's incoming and outgoing calls for that night. Detective McCartney stated that the earliest outgoing call from Defendant's phone was a call to the victim's mother at 7:54 p.m. The next outgoing call was made to Defendant's brother at 7:57 p.m., and the next outgoing call was placed to Mr. Larrison a few seconds later. The last outgoing call from Defendant's cell phone was to the victim's mother at 8:00 p.m.

Detective McCartney stated that, during her interview with Defendant, Defendant told her that she turned on the water in the bathroom for a shower but that she did not take one. Defendant mentioned that she turned on the water and turned it off and said that she was "very sure" she had done so. However, Detective McCartney testified that, when she photographed the bathroom, there was no water in the bathtub. Additionally, she said that she did not see any signs of a disturbance or struggle in the house. She said that she looked closely at Defendant's chest but did not see any injuries to Defendant. She explained that Defendant remained at the scene for several hours and was then taken to the sheriff's office for further questioning.

Detective McCartney testified that she and Detective Lovell also conducted an interview with Defendant at the sheriff's office. During this interview, Defendant again said that she and the victim had argued leading up to the shooting, explaining that they had yelled at each other, spat on one another, and called each other names. She said that they argued about ringback tones on her cell phone and that the victim pushed her. Defendant said that she tried to call her brother but got no answer; she then accidentally called Mr. Larrison. Defendant said that, during her argument with the victim, the victim compared her to his ex-wife and called her names.

Defendant recounted that she went to take a shower but that the victim followed her into the bathroom where they continued to argue for ten to fifteen minutes, and then the victim shoved her in the chest. Defendant stated that she invoked the Bible and commanded the victim to leave the house. She said that the victim ran outside in the rain but eventually came back inside the house yelling at her. She stated that he had water and dirt all over his shirt. Defendant told the detectives that she put milk and water in a pot on the stove to make mashed potatoes. She claimed that the victim continued to scream at her

and call her names and that she told him to go away. Defendant said that she walked over to a chair where the victim called her more names and shoved her in the chest, causing her to fall into the chair. She said that the victim told her not to get up, to which she responded, "Who died and made you my momma? My momma's in Ohio. I'm not listening to you. Get the f*** away from me."

Defendant reported that she went back into the kitchen and saw on the microwave clock that it was 7:35 p.m. She said that the victim called her another name and that she responded, "If you don't get away from me tonight, one of us is gonna be carried out in a body bag." Defendant stated that the victim responded, "Yeah, one of us will be. And it's not going to be me." Defendant then told the victim, "Get the f***ing gun and shoot me. I'm tired of listening to you." Defendant stated, however, that the victim did not get the gun. Instead, he continued calling her names. The victim then told Defendant to pack her things, and he took off his wedding ring and set it on the kitchen counter. Defendant told the victim she would leave the next day, but when the victim said there was "only one way for [her] to leave," she told him she would not leave because it was her house too. According to Defendant, the victim then commented, "What the f*** are you going to do about it? You think you're all Miss Billy Badass." Defendant replied, "Either I'm going to shoot you or you're going to take this gun and you're going to shoot me. One of us is going to die tonight. I'm tired of listening to this. I'm not going to be your punching bag." Defendant said, however, that the victim did not retrieve the gun.

Defendant recounted that she went to the den, grabbed the gun, and pointed it at the victim. The victim, who had been in the kitchen, asked Defendant if she was going to shoot him, and he asked her where the shotgun shells were. When the victim again asked Defendant what she was going to do, Defendant said, "You know what. I've had it with you," and she put a shell into the shotgun and "clicked" the gun shut. Defendant said that the victim watched as she loaded the gun. She said that he took two steps towards her so that he was standing next to the gun safe in the den. Defendant stated that she told the victim she was either going to shoot the victim or herself. She claimed that she stood up and started to turn the gun toward herself and that the victim rushed toward her. She also said that she started to raise the shotgun toward the ceiling but "got him instead."

When questioned further about details of her statement, Defendant denied turning on the water to the shower that night. She stated that she accidentally called her brother and Mr. Larrison but that the phone call to the victim's parents was intentional. She said that the phone calls occurred after the argument in the bathroom and that she, not the victim, hung up on the victim's parents.

Defendant said that she had the gun pointed at the victim's navel but that, when she raised it to shoot herself or the ceiling, the victim "was there." Defendant claimed she did

not want the victim to corner her, asserting that he liked to do so and that he cornered her in the laundry room and beat her head on the wall on another occasion. According to Defendant, the victim also previously put his knees on her chest on two occasions and slammed her into a cupboard on another occasion. Defendant also contended that the victim "slammed" his ex-wife a few times.

Detective McCartney said that, during both of her interviews with Defendant, Defendant referred to pictures of bruises she had taken with her cell phone; however, Defendant could not explain why those photographs were no longer on her phone. Detective McCartney said that Defendant was allowed to clean herself up at the sheriff's office. Detective McCartney saw no bruising, marks, or scratches on Defendant, even when Defendant pulled down her shirt to show where on her chest the victim had allegedly slapped and shoved her. Detective McCartney said that Defendant reported putting milk, water, and butter in a pan on the stove to boil before 7:35 p.m. Detective McCartney testified that, although the stove burner was on, the liquid in the pan was not boiling by the time Defendant asked Sergeant Gardner to turn off the stove.

Forensic pathologist, Dr. Randy Tashjian, testified that he performed the victim's autopsy and determined that the victim's cause of death was a shotgun wound to the chest and that the manner of death was homicide. Dr. Tashjian said that there was a large entrance wound to the right side of the victim's chest. He noted soot marks around parts of the entrance wound, which indicated that "the barrel or the muzzle of the firearm was in relatively close proximity" to the victim when it was fired. Dr. Tashjian said that he collected shotgun pellets from inside the victim's body and a plastic shot shell wad. He testified that locating the wad inside the body again indicated that "the range was relatively close."

Dr. Tashjian took an x-ray of the victim's body and found that, in the right side of the body, there were several small pellet-like foreign bodies, which corresponded to birdshot pellets that were collected from the body. From the x-ray, Dr. Tashjian determined that the shotgun pellets entered the chest cavity and perforated the upper lobe of the right lung. He said that some of the pellets completely severed the right subclavian artery and right subclavian vein, which he explained were "major vessels that come off the heart and supply the arm and drain the arm" of blood. Dr. Tashjian testified that additional shotgun pellets went through the lungs and fractured the first, second, and third rib on the victim's right side. Regarding the direction of the shot, Dr. Tashjian stated that the pellets traveled "from top to bottom[,] . . . from front to back[,] . . . [and] [f]rom right to left." Dr. Tashjian testified that the victim was five feet ten inches tall. He said that he did not find any defensive wounds to the victim.

According to Dr. Tashjian, a toxicology report showed that the victim had a .175 blood alcohol level at the time of his death. The victim also had temazepam in his system, which Dr. Tashjian explained was a type of sedative "often used . . . for the purposes of calming nerves[.]" When asked what effect depressants like alcohol and temazepam have on a human body, Dr. Tashjian responded, "Generally, they would cause an individual to be sleepy. You know, their respiratory drive, their breathing rate would slow down. These are especially if taken in higher quantities. You know . . . their coordination would be impaired, those kinds of things."

Detective Jeff Lovell of the DCSO testified that he arrived at the crime scene at 8:30 p.m. While Detective McCartney spoke with Defendant at the scene, Detective Lovell photographed the scene and collected evidence. In the kitchen, he recovered a live shotgun shell on the floor next to the refrigerator. He said that, in her interview, Defendant said she had two shotgun shells and held the second shell in her hand when she fired the shot that killed the victim. Defendant claimed that she fired the shotgun standing "on the back wall" of the den next to the desk, facing toward the laundry room. Defendant said that, after firing the shotgun, she immediately dropped the gun on the floor and attempted to aid the victim. Detective Lovell said that he found the victim's wedding ring on the kitchen counter. He said that, in searching the residence, he saw no evidence to suggest there had been "any type of fighting, shoving, hitting, pushing, [or] destruction of property going on[.]"

During Defendant's interview at the sheriff's office, she told Detective Lovell that she was going to take a shower in the downstairs bathroom prior to the shooting. Detective Lovell testified:

> There's . . . two different versions. At one point, she said she turned the water on to take a shower and that [the victim] was mad because she turned on the heater because the floor gets cold, the tub gets cold.
>
> And then at another point, she said she never turned the water on.

Detective Lovell said that he documented the bathtub in the downstairs bathroom and that he did not see "a single drop of water in the tub."

Detective Lovell said that he documented the laundry room, which contained the victim's boots on top of a boot dryer. Contrary to Defendant's story, the victim's boots were not muddy or dirty. Detective Lovell explained, "[Defendant] rebuked [the victim]. He ran outside. And when he came back in, he was wet and covered in dirt and mud[.]" Detective Lovell testified, however, that he did not see any evidence of the victim's

- 10 -

tracking mud into the house, describing the house as "immaculate." Further, he did not see any indication of mud or dirt on the victim's body.

Detective Lovell identified a photograph of a recliner in the den that was in a "partially reclined" position. Detective Lovell explained that there was also a couch in the den with a large pool of blood on the floor beside it. The victim was lying on the floor in the large pool of blood next to the couch, and there were blood droplets "going down toward his feet[.]" Detective Lovell also documented blood droplets on the floor in front of the gun safe located in the den.

Detective Lovell said that he photographed a red basket sitting on top of a file cabinet in the den, which was where Defendant claimed the shotgun shells had been located. Detective Lovell said that there were no additional shells in the basket. While processing the scene, Detective Lovell found handwritten notes made by Defendant in a calendar and organizer on the desk in the den. He said that the notes contained Bible verses and that the last verse read, "Leviticus 20:10, '[I]f a man commits adultery with another man's wife shall surely be put to death." Detective Lovell stated that he discovered blood droplets going back towards the desk and some on the calendar.

Detective Lovell recovered the weapon used by Defendant, which he described as a 20-gauge single-shot shotgun. He also collected the spent shell casing and the live round from the kitchen floor. He towed Defendant's car and took an inventory of it. He said that, in the trunk, he found a trash bag that contained eye and hearing protection. He agreed that he participated in the Defendant's interview at the sheriff's office. Detective Lovell testified:

> One of the things that did stand out to me . . . was that during our interview at the sheriff's office, at no point did [Defendant] say she was in fear or was in any imminent threat when she went back there and actually got the gun and introduced it into the situation.

Detective Lovell identified a photograph of the victim's gun safe taken in February 2021 after it was opened by the victim's ex-wife at his request. He noted that it contained a black box with assorted "shells and boxes of ammunition[.]" He said that the safe door was not open when police arrived at the scene the night of the shooting.

On cross-examination, Detective Lovell agreed that Defendant had described the fighting with the victim that night as involving a "shove, a slap, and screaming and yelling."

Special Agent Alex Brodhag testified that he worked at the Tennessee Bureau of Investigation (TBI) crime laboratory in Nashville as a firearms examiner. Agent Brodhag

said that he examined a 20-gauge Harrington and Richardson shotgun in connection with this case. He said that, initially, he examined the shotgun and determined that it was working as intended. He checked the shotgun's safety devices and ensured that they were also functioning properly. Agent Brodhag explained that the particular model of the shotgun contained an internal safety called a "transfer bar." He stated that it was "not something that the user turns on and off. It's just part of the design of a weapon." He continued:

> And . . . what that transfer bar does is when the trigger is pulled, the hammer will go forward. And as the trigger is pulled, it lifts up the transfer bar and the handler hits the transfer bar and then the transfer bar hits the firing pin. But in order to do that, the trigger has to be pulled. If the trigger were to be let go, that transfer bar there in the center will retract down so that the hammer cannot come in contact with the firing pin.

He agreed that, without pulling the trigger, the shotgun would not fire. Agent Brodhag then demonstrated for the jury how the shotgun worked, explaining:

> First thing that's necessary to do is break it. There's a lever here that will release it so the barrel will pivot up. You then put a shot shell in the chamber and close it. And then if you want to fire it, you need to bring the hammer back and then pull the trigger.

Agent Brodhag stated that he test-fired the shotgun using shells similar to those submitted as evidence; he then compared the test-fired shot shells with the shot shell submitted as evidence. He concluded that the shot shell submitted as evidence had been fired in the same shotgun. Agent Brodhag further testified that he conducted a "muzzle to garment distance determination" test and concluded, based upon the shot pellet pattern on the victim's clothing, that the shotgun was fired two to nine feet from the victim.

Patricia Rich, the victim's ex-wife, testified that she was married to the victim for twenty-eight years before they divorced in May 2016. During their marriage, they lived in the residence on Log Wall Road on the victim's parents' property. She denied that the victim was ever violent towards her. When asked if their divorce was "attributed to any type of violent outbursts or violence or intimidation or assault or abuse in any way[,]" the victim's ex-wife responded, "Absolutely not." She said that she attributed the divorce to a "mid-life crisis" on the victim's part after he suffered an injury and was unable to work. She said that she had never seen the victim be violent toward anyone.

The victim's ex-wife stated that because she and the victim had two young children, they purchased a gun safe for storing their firearms. They installed the gun safe inside the

house in 1997 or 1998.  She said that, when she lived in the residence with the victim, neither she nor the victim would leave firearms "loose about the house[.]"  She said that the firearms and ammunition were "always kept in the safe[.]"  She stated that the safe could only be opened by a combination or by key.  She said that, in 2015, both she and the victim had a key to the safe and that, when she moved out in 2016, she kept her key.  Regarding the operation of the safe, she testified:

> The way this safe works is you can have the key and you turn it so far and then you're able to open the door.  But if you have spun the combination, you cannot open the safe with just the key.  You have to have the combination to open it.  So it's a dual lock.

The victim's ex-wife said that they had the combination to the safe "locked up in another small safe box[.]"  She said that, after she moved out of the house, the victim could access the gun safe using his key.  She explained, however, that at some point "the combination spun . . . [s]o he was unable to open the safe."  She learned that the victim could not access the gun safe after he mentioned to their youngest son, Austin, how much money it was going to cost to get someone to bore the lock open.  The victim's ex-wife explained, "So because I was mad at [the victim] and Austin was trying to purchase a vehicle, I told [the victim] . . . give Austin some money and I will send Austin over with . . . the combination to the safe."  The victim's ex-wife said that she then wrote the combination to the gun safe on a piece of paper, which Austin gave to the victim.  She testified that, in February 2021, she opened the safe for detectives to photograph inside.

The victim's ex-wife testified that, as part of their divorce agreement, the victim was ordered to pay her alimony on the 5th of every month but that she did not receive a check by the 5th of January 2017.  She explained:

> So I was in communication with [the victim].  And he kept telling me it had been mailed over a week ago, you know, blamed it on the post office, whatever.  He asked me one more time to go to my post office box to check and see if it was there.
>
> I do remember it was snowy and icy that day.  I wasn't real happy about having to go up there, but I did.  And I got to work and I called him and I told him, I said, "[L]ook, the check is not there."  So he told me, "[D]on't worry about it.  I've got my checkbook.  When I get off from work, I will stop by your office and just write you another check."
>
> . . . .

- 13 -

Well, then the next thing I know, one of the other ladies in the office came to get me and she said . . . somebody is out front. And it was [D]efendant.

She said that Defendant handed her an envelope and told her that the post office put it in the wrong post office box and that it "ended up back in their box[.]

The victim's ex-wife stated that she and the victim began talking again at the end of December 2016 and that she began keeping a journal regarding their interactions. The following exchange then occurred:

Q. Okay. Did his death . . . in March of 2017, looking back now at your -- some of your journal entries, does it surprise you?

A. No.

Q. Why is that?

A. He had called me a few times and --

At this point in the testimony, Defendant raised a hearsay objection, and the trial court held a jury-out hearing. During the hearing, the victim's ex-wife testified that she kept a journal detailing the interactions and conversations she had with the victim leading up to his death. She read a series of those journal entries at the State's request. She testified that she was unable to remember the exact content of the entries without referring to the journal and said that it would be easier for her to read directly from the journal. She agreed that the journal entries were accurately dated and reflected the dates upon which she wrote them.

Defendant objected to the admission of the journal entries, arguing "[w]e've got two hearsay problems here. One, what [the victim] is saying is hearsay and the entire journal is hearsay[.]" The State responded that the entries fell under Tennessee Rule of Evidence 803(3), as then existing mental, emotional, or physical conditions, and that the journal was admissible under Tennessee Rule of Evidence 803(5), as a recorded recollection. Defendant acknowledged that the hearsay exception in Rule 803(3) might apply "in one or two circumstances" but asserted that "most of these times, it's [the victim] coming to her talking about what happened the previous day or what was happening behind the scenes at the house. It's not something where he's saying, '[S]he just hit me,' or something like that."

- 14 -

During a recess, the trial court reviewed "each page . . . and each date" of journal entries and then announced the portions of the journal that were admissible. In making its ruling, the trial court stated:

> So under [Rule] 803(3), that rule states "then existing mental, emotional, and physical condition. The following are not excluded by the hearsay rule: A statement of the declarant's then existing state of mind, emotional, sensation, or physical condition such as intent, plan, motive, design, mental feeling, pain and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, et cetera, of a will."

> And then you go on down to the beginning. Cohen's Sixth Edition, 803(3), Section 2. It says, "State of Mind Hearsay Exception. Although 803(3) is commonly referred to as the state of mind hearsay rule, it extends to a number of mental processes that stretch the concept of the state of mind. Thus, by its own terms, Rule 803(3) reaches emotions, sensations, and physical condition. As illustrations of these processes, the rule cites seven examples: Intent, plan, motive, design, mental feeling, pain, and bodily health. It should be obvious that these examples reflect an intent that this hearsay exception be read broadly to embrace virtually all mental processes that the declarant can describe."

> And then it goes onto say, "as described in the next section, statements falling under 803(3) can be used to prove mental condition, conduct, and physical condition."

> Under section 4 here, 8.08 section 4 in the book . . . it says, "[T]his principle can be illustrated by the statement 'on Monday, I love Karen.' If the issue is whether the declarant loved Karen on that day, the statement is hearsay but admissible under rule 803(3), a state of mind. If the issue is whether the declarant loved Karen on Sunday, the day before the statement was made, the statement is also admissible. The declarant's statement is admissible under 803(3) expressing a then-existing state of mind because it asserted his feelings at the time the statement was made," in parentheses Monday.

> "Using the rules of logic inherent in 401's test of relevance, the declarant's feelings towards Karen on Monday are some evidence of the declarant's feelings toward her the day before. By a parity of reasoning, the declarant's feelings towards Karen on Monday may also be used to prove the

- 15 -

declarant's feelings toward her on Tuesday. Logically, a declarant's feelings for a person on one day are at least some evidence of the declarant's feelings toward that person the next day. At some point, however, mental state on one day may become irrelevant or only slightly helpful in assessing mental state far in the future or past."

And, of course, basically what we have here is the days it looks like what they're trying to admit here . . . is from December 30th pretty much up until the time of death, pretty close, the day before I believe, and so that's less than three months anyway -- if my math is right, less than three months, less than 90 days there is this journal entry. So the [c]ourt, you know, does find it relevant.

The trial court also ruled that the victim's ex-wife could read the journal entries into the record because the journal fell under the recorded recollection exception of Tennessee Rule of Evidence 803(5), after finding that the witness's recollection was insufficient to allow her to testify fully and accurately and that the journal entries were created when the matters were fresh in her memory. The court further found that, under Tennessee Rule of Evidence 401, the journal entries were relevant. The court stated that it considered whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under Rule 403 and concluded that "most of it [was] not." The court ordered redacted the portions of the journal entries that it found to be unfairly prejudicial.

Following the jury-out hearing, the victim's ex-wife testified that she began keeping a journal after her separation from the victim and that, in the journal, she recorded things that the victim had said to her and her thoughts about those things. She said that the first journal entry was dated December 30, 2016, and that her last journal entry was dated March 19, 2017, one day before the victim's death. She then read the following from her journal entries:

• December 30, 2016: "[The victim] [s]aid he woke up thinking about what today was and said, '[S]trange, it's sad ol' Kevo effed up again. What a fool am I.'"

• January 6, 2017: "So been going back and forth with [the victim] about where my alimony check was. Claimed it was mailed a week ago. Kept telling me to check the box. Well, of course, it snowed and there's ice on the roads, but I went to the post office. Still no check. So I told him. He said he'd take care of it and just bring me another check."

- 16 -

• January 7, 2017: "At least he called me today. Almost was like old times. First he called me at work. Then again on my cell. It's probably the"[1]

• January 8, 2017: "I'm beyond worried. [The victim] called me twice last night. Both times he was crying. [The victim] hardly ever cries, so I knew it was bad. He asked me to listen and not talk, so I did. He said he was sorry and he didn't know how to get out of his mess. He kept telling me how mean and controlling she is. Said when she gets mad, she spits in his face and hits him. The second time he called, I told him to just leave. He said he had nowhere to go, but I told him he could come stay with me. He said he was too scared, that she said she would shoot him if he ever left her. He promised his guns were locked up."

• January 9, 2017: "Friday [the victim] had text[ed] me from his work number. So I text[ed] him on that number to check on him. He said he was okay but had not received my text on his other phone."

• January 10, 2017: "Asked [the victim] if we could ever be friends again. He said yes. That would be golden. He said he would stop one night at State Farm and see me."

• January 11, 2017: "[The victim's] birthday. I couldn't resist. I sent him a smiley bunch of flowers. He loved them. Talked and text[ed] him for a long time today. He thinks it[']s funny to call my work phone from different numbers. Says he loves me not knowing who's calling."

• January 19, 2017: "Called and talked to [the victim] for a while. He told me about a dream he had back in June. Said he was in the back of the truck asleep by himself and he had a horrible nightmare. Said it woke him up and he rolled over to grab me. He remembers thinking, 'Dob, you aren't going to believe this nightmare I had.' Then he fully woke up and said he realized I wasn't there and that the nightmare was actually his life. He was crying again and asking me how to get out of his mess. I told him again that he could come stay with me, but again he said he couldn't leave. Not only has she threatened him, but also his --"

• January 28, 2017: "Well, after [the victim] kept not showing up at State Farm at night, when he text[ed] me yesterday to say he would stop by Chase on his way to Saint Thomas, I tried not to get my hopes up. He showed up. I couldn't get over how much weight he's gained, but it felt so good to get a hug. His eyes were so sad. He kept hugging me saying how sorry he was."

---

[1] This portion of the sentence was cut off in the copy of the journal.

• February 3, 2017: "Been talking and texting [the victim] some more. He keeps telling me we need to get together and talk. With our work schedules, it's going to be hard, but hopefully we can. The other day he called and left me a message saying there was an issue with the fridge and wanted to know if I wanted some food."

• February 5, 2017: "Well, well, well, that was interesting. [The victim] called me at work and elaborated on the fridge ordeal. It didn't go out. It seems that she left the door open to the freezer all day. Said she blew a gasket over it. And when he told her he called me and offered some food to me and the boys, she got the garbage can and threw it all out. Said over and over again she would never let him give any of that food to me."

• February 7, 2017: "I sent [the victim] some pictures of Bubba when he was first born. I had to call and tell him the funny. We both bought him the exact same card. Can't deny how well we know each other still yet. Some things you can't change. We had too many years together. We were both pretty emotional over it. Sure was a different conversation than the one we had last year. As much as he's devastated me[.]"

• February 26, 2017: "I'm really getting worried about things he's telling me. He's not in a good situation. I don't understand it. He's always been such a man. And he tells me that if she doesn't like something he says or does, that she pounces on him. He said she gets him down and will slap him around."

• February 28, 2017: "Things are getting really bad for [the victim]. He said he's scared. The goofball must have mentioned me because she informed him that she'd snap me like a twig. Ha. Like to see her try that one. She stole what is mine and I will get him back. He's always been my best friend. I need him just like he needs me."

• March 3, 2017: "Asked [the victim] if he could come by and fix my drain issue. He said yes. Just give him a couple of weeks and he'd stop by."

• March 13, 2017: "Talked to [the victim] a few times today. He's trying to get Bubba a job in Nashville. I just remembered something he asked me to do. He said since she still takes his phones and goes through them every so often, I need to send a crappy text to him."

• March 14, 2017: "Talked to [the victim] again. Said he has what he needs to snake out the drain and he will be over next week. He sounds so sad."

• March 18, 2017: "[The victim] stopped by the office for a hug. Said things were really bad at home. Told me for the last two or three months she keeps saying if he wants out, she won't let him. I asked him why, for a millionth time. He did say when they met,

she was giving him kinky sex. That kills me to write. And it got out of control. By the time he straightened out, it was too late. He had destroyed his family and she was abusing him. He said he was so ashamed to admit that a woman was doing that to him."

• March 19, 2017: "[The victim] text[ed] me that he could get me a newer fridge."

On cross-examination, the victim's ex-wife testified that, while married to the victim, she and the victim argued but that they never physically fought with one another. She said that, prior to his death, the victim told her that he wanted to "get back together" with her but acknowledged that her journal entries did not reflect this.

During a charge conference, defense counsel requested that the trial court instruct the jury on self-defense, asserting that the issue of self-defense had been raised by the proof. Defense counsel argued, "I think that's the standard that it's been raised by the proof. Not what the defense may have been arguing or what the defense may argue. It's separate from that." The State objected to the instruction, arguing that Defendant "never asserted she acted in self-defense . . . through all of her statements that were recorded and played for the [c]ourt. She introduced the shotgun, she loaded it. If anybody [was] entitled to assert self-defense in this case, it would have been [the victim]." When asked by the trial court what proof raised the issue of self-defense, defense counsel responded, "Well, . . . [Defendant], in her statements, expressed fear. She was afraid she was being attacked. I don't think the fact that her intent to shoot the ceiling excludes self-defense. That's part of defending herself."

The trial court stated that, in determining whether to instruct self-defense, the court looked to the Tennessee Supreme Court case of *State v. Cole-Pugh*, 588 S.W.3d 254, 260 (Tenn. 2019). The trial court quoted from the opinion, stating that:

> [t]he quantum or proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence. To determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor.

*Id.* (quoting *State v. Perrier*, 536 S.W.3d 388, 403 (Tenn. 2017) (internal citation omitted)). The trial court found "that the proof to raise the instruction for self-defense ha[d] been insufficient for the [c]ourt to do so, and there's not enough there for the [c]ourt to believe it's necessary to do the instruction to the jury on self-defense."

At the close of proof, the State announced that it would submit only Count Two, first degree premeditated murder, for the jury's consideration. Following deliberations, the jury convicted Defendant of that charge, and the trial court imposed a life sentence.

Defendant filed a timely motion for new trial. Following a hearing, the trial court entered a written order denying relief. This timely appeal follows.

## II. Analysis

### *Sufficiency of the Evidence*

Defendant contends that the evidence is insufficient to support her conviction for first degree premeditated murder, arguing that the State failed to establish that she acted intentionally and with premeditation. She asserts that the evidence is "uncontroverted," based upon her statement to police, that it was her "intent to shoot into the ceiling as an act of self-defense" and that "no evidence exists to contradict this mind set[.]" The State responds that the evidence is sufficient to sustain Defendant's conviction for first degree premeditated murder. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1) (2017). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn.

Code Ann. § 39-11-302(a) (2017). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2017). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). These circumstances include, but are not limited to:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

*State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003) (citing *Bland*, 958 S.W.2d at 660; *State v. Pike*, 978 S.W.2d 904, 914-15 (Tenn. 1998)). This court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted). In addition, a jury may infer premeditation from a lack of provocation by the victim and the defendant's failure to render aid to the victim. *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *Davidson*, 121 S.W.3d at 614 (citing *Suttles*, 30 S.W.3d at 261; *Pike*, 978 S.W.2d at 914).

Viewed in the light most favorable to the State, the evidence at trial established that Defendant shot the victim in the chest with a 20-gauge shotgun from a distance close enough to leave soot marks on the victim. Although Defendant initially told the victim's mother that the victim shot himself, she later admitted to shooting him but claimed that she did it accidently as she was raising the shotgun either to shoot the ceiling or herself. Despite Defendant's claim that she was raising the gun when she shot the victim, Dr. Tashjian testified that the autopsy showed the shotgun pellets entered the victim's chest in a downward trajectory. Agent Brodhag testified that he examined the shotgun and found that it was in proper working order. He explained that, in order for the weapon to fire a shot, Defendant had to "break it[,]" "put a shot shell in the chamber and close it[,]" "bring the hammer back and then pull the trigger." As noted by the State, the jury heard

Defendant's claim that the shooting was accidental, weighed that claim in relation to the other evidence presented at trial, and reconciled the evidence in the State's favor. A rational jury could find from the proof presented that Defendant acted intentionally when she shot and killed the victim.

A rational jury could also find that Defendant acted with premeditation based upon Defendant's procurement of the weapon, use of the deadly weapon on an unarmed victim, and the nature of the killing. *See Davidson*, 121 S.W.3d at 615; *Bordis*, 905 S.W.2d at 222. Based upon the evidence, the jury could reasonably infer that Defendant retrieved the shotgun and ammunition from the gun safe sometime after the victim's son provided the victim with the combination to unlock the safe. On the night of the offense, she used the 20-gauge shotgun to shoot the victim in the chest from relatively close range, causing catastrophic injuries to the victim and his death. Following the shooting, Defendant told multiple, inconsistent stories to the victim's mother, responding officers, and detectives— many details of which were not supported by physical evidence at the scene.

The jury could also infer premeditation based upon Defendant's previous threats and declarations of her intent to kill the victim. *See Davidson*, 121 S.W.3d at 615. She previously told the victim's mother that, if she had known the combination to the gun safe, she would have shot the victim during an argument. A little over a month before the murder, the victim told his ex-wife that Defendant had threatened to shoot him if he ever left her. Defendant also admitted that, on the evening of the shooting, she was holding the shotgun when she told the victim, "[E]ither I'm going to shoot you or you're going to take this gun and you're going to shoot me. One of us is going to die tonight." She also admitted that, before she loaded the shotgun, she told the victim, "I've had it with you." Detectives also found a Bible quote written by Defendant at the scene of the shooting that stated, "Man committeth adultery with another man's wife—shall surely be put to death."

Finally, the jury could infer that Defendant acted with premeditation because the State presented evidence of Defendant's motive to kill the victim. *See Bordis*, 905 S.W.2d at 222. The evidence showed that the victim and Defendant had a troubled marriage and that the victim, who had come to regret divorcing his ex-wife, had resumed communications with his ex-wife in the months leading up to the shooting. Defendant reported that, on the evening of his death, the victim removed his wedding ring and told Defendant to leave their house; Defendant previously told the victim that, if he ever left her, she would shoot him. Accordingly, we conclude that there is sufficient evidence to support Defendant's conviction for first degree premeditated murder. Defendant is not entitled to relief.

## *Self-defense Jury Instruction*

Defendant further contends that the trial court erred by failing to instruct the jury on self-defense, asserting that the defense was "more than fairly raised by the proof." She avers that, taken in the light most favorable to the defense, the evidence showed "a volatile relationship" between Defendant and the victim and "contain[ed] examples of activity that . . . would necessitate a jury instruction on self-defense." The State responds that the trial court properly determined that a jury instruction on self-defense was not warranted. We agree with the State.

"It is well-established in Tennessee that the trial court has the duty of giving a correct and complete charge of the law applicable to the facts of the case and that the defendant has the right to have every issue of fact raised by the evidence and material to the defense submitted to the jury upon proper instructions by the trial court." *State v. Green*, 995 S.W.2d 591, 604-05 (Tenn. Crim. App. 1998) (citations omitted). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). Whether jury instructions are sufficient is a question of law, which we review de novo with no presumption of correctness. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). "The omission of an essential element from the jury charge is subject to harmless error analysis." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010) (citing *State v. Garrison*, 40 S.W.3d 426, 434 (Tenn. 2000)). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" *Id*. (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)).

"Once a general defense is fairly raised, it is incumbent upon the State to negate, beyond a reasonable doubt, the application of a general defense." *State v. Cole-Pugh*, 588 S.W.3d 254, 264 (Tenn. 2019). As noted by the State, when a jury instruction issue involves a "fundamental defense" like self-defense, this court may exercise plenary review notwithstanding the lack of a written request. *State v. Ethan Alexander Self*, No. E2014-02466-CCA-R3-CD, 2016 WL 4542412, at *58 (Tenn. Crim. App. Aug. 29, 2016). As a result, we will exercise plenary review of the self-defense issue notwithstanding Defendant's failure to make a written request in this case.

Tennessee's self-defense statute provides, in relevant part:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before

threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death, serious bodily injury, or grave sexual abuse;
>
> (B) The danger creating the belief of imminent death, serious bodily injury, or grave sexual abuse is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1)-(2) (2022). Acts committed in self-defense are justified, and self-defense is a complete defense to crimes of violence. *See* Tenn. Code Ann. § 39-11-601 (2022); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

In *Perrier*, 536 S.W.3d at 402-03, our supreme court stated the following:

> As this Court explained in *State v. Hawkins*, [406 S.W.3d 121 (Tenn. 2013),] self-defense is a general defense and as such it need not be submitted to the jury unless it is "fairly raised by the proof." Tenn. Code Ann. § 39-11-203(c) [2018]. The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence. To determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. Whenever admissible evidence fairly raises a general defense, the trial court is required to submit the general defense to the jury. From that point, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply.

- 24 -

*Hawkins*, 406 S.W.3d at 129 (citation omitted).

> Within this structure, the trial court makes the threshold determination whether to charge the jury with self-defense, and we conclude that the trial court, as part of that threshold determination, should decide whether to charge the jury that a defendant did not have a duty to retreat.

*Id*. at 403.

In this case, the trial court did not err by declining to instruct the jury on self-defense because it was not fairly raised by the proof. Viewed in the light most favorable to Defendant, no evidence suggested that Defendant believed she was in imminent danger of death or serious bodily injury when she shot the victim. Defendant gave three separate statements to law enforcement, with the statement given to Sergeant Gardner being arguably the most favorable to Defendant's claim. In that statement, Defendant told Sergeant Gardner that she and the victim had argued that evening when the victim returned home, that the victim had slapped her in the chest and shoved her during the argument, and that, when she told the victim she would not take any further abuse from him, he threatened that she was "leaving tonight in a body bag." However, as noted by the State, a slap and a shove do not constitute serious bodily injuries within the meaning of the self-defense statute, and detectives saw no injuries to Defendant. Moreover, Defendant's statements to police suggest that she did not truly believe the victim's verbal threats. She told Sergeant Gardner that she responded to his comment about a "body bag" by saying, "Whatever . . . [b]ring it on. I don't care." Defendant claimed that the victim then went to the den and retrieved the shotgun from between the desk and the wall but that he could not find any shells. Defendant recounted that the victim threatened to shoot her, to which she replied, "Go ahead." She admitted that the victim never loaded the gun and that he returned the unloaded gun to its location beside the desk.

Defendant acknowledged that she reintroduced the shotgun into the argument and that the victim was unarmed when she shot him. She said that the victim was standing in the kitchen when she went to the den to retrieve the gun. She recounted that the victim stood next to the gun safe in the den and watched her load the shotgun and that he rushed toward her as she raised the gun. Defendant never claimed she shot the victim in self-defense, nor would such a claim be reasonable under these circumstances. Instead, Defendant consistently maintained that she shot the victim by accident, despite asserting that the victim had been abusive in the past and that he had slapped her and threatened her on the evening of the shooting. Because Defendant denied intentionally firing the shotgun at Defendant and claimed that she shot the victim by accident, Defendant cannot also claim that she shot the victim in self-defense. *See e.g., State v. Blackwood*, No. W1999-01221-CCA-R3-CD, 2000 WL 1672343, at *9 (Tenn. Crim. App. Nov. 2, 2000) (holding, in a

case in which "the defendant claimed that he only fired his own gun in the air after he was attacked," that "notwithstanding the improbability of the defendant's testimony, he was not entitled to a self-defense instruction, because even according to his own testimony, he did not intentionally fire at anyone"), *perm. app. denied* (Tenn. May 21, 2001). The evidence at trial did not fairly raise a claim of self-defense; therefore, the trial court properly refused the instruction.

Furthermore, we conclude that, even if the trial court did err in failing to provide a self-defense instruction, such error was harmless beyond a reasonable doubt because no reasonable jury would have concluded that Defendant acted in self-defense. *See Perrier*, 536 S.W.3d at 404-05 (concluding that the trial court's error in instructing the jury regarding self-defense was harmless beyond a reasonable doubt "because no reasonable jury would have accepted the defendant's self-defense theory"). Defendant is not entitled to relief on this claim.

### Right to Confrontation

Defendant contends that the trial court committed reversible error by allowing the victim's ex-wife to testify concerning statements the victim made, which the victim's ex-wife recorded in a journal. Defendant asserts that the trial court's "extensive analysis of the Tennessee Rules of Evidence, 803 and 805, [was] misdirected" and that the "paramount issue [was] whether allowing the evidence violated . . . Defendant's constitutional right to confrontation." The State responds that Defendant has waived her claim that the trial court erred by admitting testimony from the victim's ex-wife about her diary entries in violation of the Confrontation Clause. We agree with the State.

During the testimony of the victim's ex-wife, Defendant raised a hearsay objection to her journal entries. Defendant's objection was not based upon a claimed violation of her right to confrontation. Moreover, Defendant did not raise the issue under the Confrontation Clause in her motion for new trial. A defendant may not object to the introduction of evidence, such as testimony, on one ground at trial but rely on a different ground on appeal. *See State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) ("It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal"). Additionally, Tennessee Rule of Appellate Procedure 3(e) provides that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." We conclude, therefore, that Defendant has waived the claim of a Confrontation Clause violation by failing to raise the claim at trial and in her motion for new trial. Although this court may consider an otherwise waived issue for plain error, Defendant has not requested plain error review, much less

established that she would be entitled to relief on that basis. *See State v. Bledsoe*, 226 S.W.3d 349, 354-55 (Tenn. 2007).

In one sentence under this section in her brief, Defendant claims that the trial court "erred in determining the prejudicial effect of this evidence did not outweigh any probative value." Defendant did not raise this issue in her motion for new trial. *See* Tenn. R. App. P. 3(e). Moreover, an appellate brief must contain an argument "setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record." Tenn. R. App. P. 27(a)(7)(A). "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also State v. Sanders*, 842 S.W.2d 257, 260 (Tenn. Crim. App. 1992). Defendant has not cited any authority related to prejudice or offered an argument as to why the testimony from the victim's ex-wife was more prejudicial than probative. Thus, to the extent Defendant was intending to raise a standalone claim under Rule 403 of the Tennessee Rules of Evidence, the claim is waived. Defendant is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 27 -